Filed 1/6/16  Koch v. Scientific Image Center Management CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION 2

| | |
|---|---|
| R. JAMES KOCH,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>SCIENTIFIC IMAGE CENTER MANAGEMENT, INC.; et al.,<br><br>     Defendants and Respondents. | A139372<br><br>(San Mateo County<br>Super. Ct. No. CIV513706) |

BY THE COURT:

It is ordered that the opinion filed herein on January 5, 2016, be modified as follows:

On page 20, footnote 8, the bolded and bracketed language "[**re-check this before filing**]" should be deleted.

There is no change in the judgment.

Dated:_____              _____

                                                         Kline, P. J.

Filed 1/5/16  Koch v. Scientific Image Center Management CA1/2 (unmodified version)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION 2

| | |
|---|---|
| R. JAMES KOCH,<br><br>　　　　Plaintiff and Appellant,<br><br>v.<br><br>SCIENTIFIC IMAGE CENTER<br>MANAGEMENT, INC.; et al.,<br><br>　　　　Defendants and Respondents. | A139372<br><br>(San Mateo County<br>Super. Ct. No. CIV513706) |

**INTRODUCTION**

Plaintiff R. James Koch, a medical doctor and plastic surgeon, filed the instant action against defendant Scientific Image Center Management, Inc. (SICM), and the affiliated plastic surgery clinics for whom he worked, alleging that he was wrongfully terminated for complaining about various policies and practices adopted by SICM.  The trial court granted summary judgment, finding that Koch had failed to demonstrate the existence of a triable issue of fact as to whether SICM had terminated him.  Koch appeals, arguing that a triable issue of fact exists as to whether SICM terminated him and whether this termination was causally related to his complaints, which he contends were protected activity under Business and Professions Code section 2056 and Health and Safety Code section 1278.5.  Finding triable issues of fact as to each element of Koch's wrongful termination claims, we reverse the trial court's grant of summary judgment and remand this action for trial.

1

**FACTUAL AND PROCEDURAL BACKGROUND**

I.    *Background of Koch and Scientific Image Center Management, Inc.*

        Dr. David Kent, a facial plastic surgeon with a private practice in Troy, Michigan, developed a minimally invasive facelift procedure that required only local anesthetic and no hospitalization. Kent trademarked the phrase "Lifestyle Lift" to describe this procedure. Between 2001 and 2006, Kent began opening clinics across the country to perform facial plastic surgery operations, including Lifestyle Lift procedures. For each clinic, Kent formed separate professional corporations and then negotiated with interested doctors in the area to start the clinic. By 2006, there were approximately 19 clinics in operation. Kent formed defendant Scientific Image Center Management, Inc. (SICM) to manage the day-to-day administrative, non-medical, business operations of each clinic.

        Plaintiff R. James Koch is a facial plastic surgeon, board certified in otolaryngology-head and neck surgery, facial plastic and reconstructive surgery, and medical management. He is licensed to practice medicine in nine states, including California and Florida. In 2006, Koch was serving as an associate professor of otolaryngology at Stanford University School of Medicine as well as the assistant chief of the otolaryngology section at the Department of Veterans Affairs Hospital in Palo Alto.

        In February 2006, Kent wanted to open a Lifestyle Lift clinic in the San Francisco Bay Area. Kent and Koch discussed having Koch open such a clinic in San Mateo County. These negotiations culminated in Kent forming defendant Golden Gate Surgical, P.C. (Golden Gate Surgical), which then entered into a contract with Koch in August 2006. This contract described Koch as an independent contractor who was to provide cosmetic surgery services to Golden Gate Surgical's patients. The agreement provided for a one-year term, which would automatically renew unless either party provided written notice at least 45 days before the expiration of the term. Golden Gate Surgical was obligated to provide Koch with "space, equipment and personnel customarily found in plastic and cosmetic surgery practices" as well as medical malpractice insurance. Koch was to be paid a minimum of $25,000 a month ($300,000 a year), adjusted monthly to Koch's actual earnings based on surgical procedures he performed that month. Either

party was permitted to terminate the agreement for any reason or no reason after giving 30 days written notice.

In 2007, Koch's role in Kent's Lifestyle Lift clinics expanded. Koch entered into discussions with SICM to assume the role of SICM's administrative medical director. On April 25, 2007, Kent sent Koch's corporation, R. James Koch, Inc. (Koch, Inc.),[1] a letter outlining the terms of their agreement to have Koch, Inc. perform the duties of administrative medical director for SICM. On July 26, 2007, SICM and Koch, Inc. executed a formal written agreement that reflected the terns contained in the April 25, 2007 letter (Medical Director Agreement).

The Medical Director Agreement described Koch, Inc. as an "independent contractor" and provided that the agreement "shall not constitute the formation of a partnership, joint venture, employment or master/servant relationship." The agreement provided for a one-year term, which would renew automatically unless either party provided 30 days' written notice prior to the expiration of the term. Additionally, either party could terminate the contract for any reason or no reason by giving 30 days' written notice to the other party. As compensation for providing the services of administrative medical director, Koch, Inc. would receive a monthly "consultant fee" of $58,333.33 per month ($700,000 a year).

As administrative medical director, Koch provided medical and surgical administrative support, provided medical advice to doctors, visited the Lifestyle Lift clinics to observe the physicians and perform quality reviews, trained the physicians on Lifestyle Lift procedures, investigated reports related to doctors' quality of care, assisted in the recruitment of new doctors, and served as an expert witness in Lifestyle Lift litigation. Additionally, Koch became a member of SICM's Senior Business Team and attended weekly meetings and saw company decisions and policies be implemented. Koch was required to report to the Senior Business team regarding problems that required attention, such as a doctor with a high number of surgical complications.

---

[1] Koch formed a corporation in February 2007.

3

In addition to becoming SICM's administrative medical director, Koch also executed contracts with defendants Coronado Surgery Associates, P.C.; Santa Ana Surgery Associates, P.C.; and Beverly Hills Plastic Surgery Center, P.C. These contracts provide that each professional corporation "desires to contract with [Koch] as an employee to render certain cosmetic surgery services." The contracts could be terminated upon 45 days' written notice by either party, for any reason or no reason.[2] The $700,000 annual salary paid to Koch, Inc. under the Medical Director Agreement compensated Koch for both his work as administrative medical director as well as for any surgical work he performed under these contracts.

In his declaration, Koch states that after assuming the role of administrative medical director, he continued to perform surgeries at Golden Gate Surgical in San Mateo as well as surgical repair of complications in other Lifestyle Lift clinics through the first half of 2010. Koch's time performing operations decreased as his administrative and training duties as medical director increased.

Also in 2007, Kent retained Gordon Quick as a consultant. Kent sought advice regarding improving Lifestyle Lift's infrastructure and being CEO of a rapidly growing company. In 2008, Kent made Quick President of SICM. In early 2010, Quick became CEO of SICM and Kent became President. Quick hired Steven Higginbotham as SICM's Chief Operating Officer (COO).

II.     *Koch's Concerns and Complaints Regarding Dr. Farhan Taghizadeh and SICM Policies and Procedures*

In 2006, Kent hired a doctor named Farhan Taghizadeh to work in the Lifestyle Lift clinic in Albuquerque, New Mexico. In September 2007, Koch received an email from the Albuquerque clinic's office manager which stated that many of Taghizadeh's patients were experiencing major infections or skin breaking down after surgery because of Taghizadeh's surgical methods. Koch believed these issues were due to Taghizadeh's inexperience and counseled Taghizadeh regarding his "poor work."

---

[2] Koch entered into a similar agreement with Defendant Lifestyle Florida East, P.C. in October 2009.

4

At some point, Taghizadeh recommended to Quick that the Albuquerque clinic obtain a surgical laser to provide skin treatment services and thus increase the clinic's business and revenue. Quick, after consultation with Kent, agreed and Taghizadeh borrowed a laser from the Lutronic company for use in the Albuquerque clinic. This resulted in a significant increase in revenue at the Albuquerque clinic. Based on this, SICM, in 2009, began exploring whether it should purchase lasers for use in the other Lifestyle Lift clinics. The company was considering lasers manufactured by four different manufacturers, including Lutronic. In his declaration, Koch states that representatives of all four laser manufacturers came to SICM's headquarters to make presentations on their lasers. He asserts that during these presentations, "Taghizadeh behaved as if he was part of the Lutronic entourage, and presented his results in such a biased way that [Koch] asked him if he had a consulting agreement with them. [Koch] was chastised by Quick for this." Koch developed a laser comparison study that would permit Lifestyle Lift physicians to provide feedback on the various lasers. He was, however, not permitted to complete this evaluation study. While Koch was still attempting to set up tests of the competing lasers in the clinics, he was informed that Quick had approved the purchase of approximately 30 Lutronic lasers, costing approximately $75,000 each. Koch protested this decision to Kent, but Kent stated it was Quick's decision.

After the decision to purchase the lasers was made, Koch began developing a "Safe Start" training program designed to assist the doctors in learning to use the lasers. Under this training program, the doctors were instructed to use the lasers at a lower density setting for approximately 3 to 4 months until they became comfortable with the lasers. It was expected that a separate "Advanced Settings" training would be released at that point. However, in August 2009, Koch learned that Taghizadeh had been giving separate training sessions to Lifestyle Lift doctors without Koch's knowledge and was recommending to the doctors that they use the laser's full density setting. Also in August 2009, Koch learned that Taghizadeh had begun conducting "business integration" meetings at the various Lifestyle Lift clinics, including those in California. These

5

business integration meetings included discussions regarding pricing structures for various procedures, the company's bonus program, and attempting to integrate the sale of laser procedures into the existing price points and packages offered by the clinics.

In September 2009, Koch began complaining to Kent and Quick about Taghizadeh. On September 6, Koch sent Kent an email stating that he felt his position as medical director had been undermined after the laser selection. Koch wrote that his "choices for our company laser were disregarded despite my extensive experience in the area" and that Taghizadeh had made many inaccurate statements in support of the Lutronic lasers. Regarding Taghizadeh's business integration visits, he stated that he had "agreed that Dr. Taghizadeh could visit centers for laser 'business integration' purposes" but that many of the topics covered in these meetings addressed medical issues without Koch's prior review. He wrote that the visits "encroach[] on my duties as Director of the Lifestyle Lift Laser Program and Medical Director. . . . Having Dr. Taghizadeh meddle with my authority . . . only undermines the unified teaching message that we are trying to give to the doctors." At the end of the email, Koch requested: "Dr. Taghizadeh should have no input, now or later, into any medical issues or decisions (including laser-related). Such involvement into medical issues should not be pursued by Dr. Taghizadeh . . . whether by meetings, telephone conferences, or during his 'business integration' visits. I have known [Taghizadeh] for 3 years and my sincere professional opinion of him is that he is a mediocre doctor who is blatantly self-promotional. We even considered replacing him when he had surgical problems that required an urgent visit from me for technical support. Also, according to PRG he has been doing free procedures to avoid news of his complications from reaching Corp. Finally, and most importantly with regard to who should solely be making medical decisions, I currently hold the title of Medical Director."

On September 11, 2009, Koch sent a similar email complaining about Taghizadeh's business integration visits. He wrote: "I am also very concerned that half of the topics of . . . Dr Taghizadeh's 'business integration' center visits involve medical issues—basic laser training, laser capabilities, and ancillary services . . . . This serves to

6

undermine the unified teaching message that we are trying to give to the doctors during this laser roll-out, and puts safety at risk."

At the end of September, Koch met with Kent and Quick to reiterate the concerns he had expressed in these emails. Koch gave a presentation that stated: "[o]nly the Medical Director is authorized to provide medical information and guidelines" and that this "helps ensure that a uniform message is sent." Regarding Taghizadeh's business integration visits, Koch argued that Taghizadeh should not be discussing medical or training issues and should also not be soliciting training or medical questions from the doctors. According to Koch, "Quick became so angry at [Koch's] criticisms of Dr. Taghizadeh that he yelled at [Koch] and tried to stomp out of the meeting."

Koch's complaints about Taghizadeh continued over the subsequent months. On November 19, Koch sent Kent another email, stating that he had "continuing concerns about my position being undermined." He informed Kent that Taghizadeh "continues to solicit and answer medical questions about the laser instead of directing them to me. In addition, he is showing the physicians on his Center visits different laser settings than what we taught during our 'Safe Start' program. The purpose of this 'Safe Start' program is so all of the physicians have a basic laser experience for safety/medico legal reasons prior to rolling-out the advanced settings." Koch stated that the "Medical Director should be the only person who dispenses medical information," and yet Taghizadeh was dispensing medical information "as if it is 'official' company information." Koch warned that this practice "would be difficult to defend should a lawsuit arise from our doctors following his medical directions." Finally, Koch expressed "concern[] about Corp Practice of Medicine issues with his center visits and the mixing of business and medicine." Koch followed up this email by sending Kent a copy of Taghizadeh's business integration meeting itinerary, telling Kent it was "[i]n reference to my email about undermining and Corp Practice of Medicine."

In December 2009, Koch learned that Taghizadeh had been observing surgeries in other clinics. During a presentation to a business committee on December 11, Taghizadeh referenced that he observed a surgery during one of his visits to a California

7

clinic.  Koch interrupted Taghizadeh and asked why he had done this.  Quick exclaimed to Koch "God damn it Jim, this is all about ego!"  That same day, Koch emailed Kent asking about Taghizadeh observing surgeries.  Kent replied to Koch's question by stating "We can keep him in his center.  He's not needed in the offices."  Koch also wrote to Kent that he had spoken to an office manager of one of the clinics who had complained about the doctors in her office.  The office manager stated that these complaints would be "straightened out soon" because Taghizadeh was coming to visit.  Koch cited this as "another example of what I have been talking about regarding being undermined."  Kent replied by stating he was "not sure what . . . [Taghizadeh is] doing to straighten something out.  Will you let me know what's going on.  I hope it isn't medical!  Why wouldn't she just tell you what the issues are?"[3]

In addition to Koch's complaints regarding Taghizadeh undermining Koch's authority, in late 2009, Koch began to receive complaints regarding Taghizadeh's improper behavior with staff and patients.  In September 2009, Pola Lichtmacher, the office manager of the Albuquerque clinic, sent an email to SICM senior executives, including Koch and Quick, about Taghizadeh's behavior.  She wrote of Taghizadeh's "lack of professionalism, . . . sexual bantering, and unsafe medical practices."  She gave examples of Taghizadeh discussing sexual preferences and behaviors with support staff, making derogatory comments about patients while they were lightly sedated, throwing instruments, and speaking on his cellular phone during surgery.  Complaints in October 2009 included claims that Taghizadeh had pushed a patient into a chair, and had a sexually explicit conversation during a procedure.

In February 2010, in response to inquiries from Kent regarding programs that could be cut to reduce SICM's expenses, Koch wrote that Taghizadeh's visits to the

---

[3] At his deposition, Kent addressed this email and denied that he meant that Taghizadeh should not be addressing medical issues.  Rather, he stated that his email simply expressed a hope that the issues in the clinic referenced by the office manager were business related (such as issues between staff), rather than medical related.  He stated that Taghizadeh had his "blessing to go out and take care of medical issues especially with the lasers."

various clinics could be cut. Koch wrote that "Taghizadeh is a poor surgeon with several claims of inappropriate sexual behavior against him. His representing the company puts us at risk, and we cannot afford his association with more lawsuits likely coming."

In April 2010 and again in June 2010, Koch had exchanges with SICM's counsel, the former during an investigation into a complaint about Quick. Koch states that he told counsel that he feared he would be targeted for termination because of his "continual protests to the company and Dr. Kent about both Dr. Taghizadeh and questionable practices of the company that may have violated the California corporate practice of medicine restrictions."

III.     *SICM Cash Flow Problems and Conway MacKenzie Recommendations*

Despite being profitable in 2009, SICM began to experience what Quick described as a "financial crunch" in the first quarter of 2010. Banks which had previously offered lines of credit to SICM called in those lines, requiring SICM to pay off approximately $10 million in bank loans. Additionally, a downturn in the economy resulted in the number of new patients plummeting.

In the wake of these developments, SICM sought to conserve cash in a number of ways. Relevant to this appeal, in April or May 2010 SICM retained the consulting firm of Conway MacKenzie to find ways to reduce SICM's expenses. Representatives from Conway MacKenzie met with senior SICM staff (not including Koch) and discussed a number of options and recommendations regarding potential cuts to reduce expenses. On June 30, 2010, Conway MacKenzie provided a draft report of its findings and recommendations. The copy of this report in the record has SICM's financial information redacted. The report stated, however, that "[f]ollowing the development of the detailed weekly cash flow budget, it was apparent that a significant cash burn would take place in the remainder of 2010."

Consequently Conway MacKenzie made a number of recommendations to reduce operational expenses. These recommendations were categorized into one of four tiers. "Tier 1" recommendations were "[s]avings actions to be implemented regardless of financial performance"—that is, changes that were recommended to be made regardless

9

of their impact on the business. "Tier 4" recommendations, by contrast, were to be implemented if "financial performance continues to deteriorate and would involve drastic action." Relevant to this appeal, one of the "Tier 1" recommendations in the Conway MacKenzie report was to "Reduce Jim Koch Pay to $400k." This would have represented a 43 percent cut to Koch's $700,000 salary. Conway MacKenzie recommended that the other members of the Senior Business Team have their base pay cut 5 to 15 percent. SICM's COO, Higginbotham, testified that the recommendation to cut Koch's salary was the result of a "side bar" conversation between Kent, Quick, and Higginbotham. During this conversation, Higginbotham stated that, in his experience, the general salary for an administrative medical director was between $300,000 to $400,000 a year. Quick testified that the sole motivating reason behind the decision to reduce Koch's salary was his view that the appropriate market-based compensation for a medical director in similar companies was $400,000 a year.[4]

IV.     *Koch's Separation with SICM*

The decision that Koch's $700,000 salary should be reduced set in motion a series of communications and actions that ultimately resulted in Koch's separation from SICM. The following is a chronology of those communications and events.

On July 7, 2010, Jeff Mosley, SICM's Chief Financial Officer, called Koch and informed him of the recommended $300,000 a year pay cut. Koch then sent an email to SICM's former COO, Ken Field, writing "Evidently I am being targeted with a huge paycut. I understand that all Execs need to take a paycut but it should be uniform. The one proposed to me is targeted and deeply insulting. I spoke with my wife about this situation and this is something we will not take. [¶] . . . [¶] Looks like this is the end of the line for me with [Lifestyle Lift]. There is a relief in many ways. I hope we can start working on the next project."

---

[4] Koch disputes that $400,000 is appropriate market-based compensation given his training, traveling, and expert witness responsibilities.

After being informed of the proposed reduction, Koch and Kent exchanged a series of e-mails. On July 8, Kent wrote Koch that "No one is against you . . . [Quick] and I have laid out a plan for 4 people in the organization to become equity owners and your [sic] one of them along with [Higginbotham] and [Quick]. I want you part of the inner circle as a stake holder. . . . As an owner I think you will think and work differently with the business (not that you already don't but it will be different.) The payoff as an owner will be tremendous. Please let [Quick] explain what we both came up with. I want you part of the top decision makers for the company going forward. We have to have a coherent team at the top[.]"

On July 15, 2010, Koch confirmed his itinerary and travel plans to conduct a fat-grafting training session with Lifestyle Lift doctors in the Cherry Hill, New Jersey clinic on July 20, 2010.

On July 16, Quick and Koch spoke about the Koch pay reduction; Quick told Koch that he would have to take a 43 percent pay cut and that this reduction was "market based." Quick also stated that Koch's assistant, Homer Abaya, would be terminated. On July 17, Kent sent Koch an email stating: "Jim I hope you had a good call with [Quick]. . . . I really think a short term hardship will pay off big time in the next few [years]! I really want you part of the team at the top. The company will be so strong after we get through this hard time from a cash standpoint. The calls are already going back up significantly and the business will follow soon. All should go as planned and the ownership portion will allow you and the rest of the top team to make a lot of money and retire comfortably if that's what you want. Please don't look short term but see the big picture. Please call me to discuss if needed but I'm sure you can see the possibility."

Koch replied to Kent the following day. He wrote that taking a "43% paycut when other Execs are taking a 10-15% paycut is certainly more than 'taking one for the team.' In fact, [Quick] said that this reduction was about having 'market-based compensation' . . . and not related to our current cash flow problems." He then reiterated his view that $400,000 did not adequately reflect his value to Lifestyle Lift, closing the email by stating: "If you want to base my salary on value to the company, then I should be

11

compensated more than $700k but all that I requested was that my paycut be equitable." Kent replied by stating that "the bottom line is we have no money (cash) and we need to cut a ton of costs. The economy has really caught up to us. Your [sic] very important to the company and critical to its function. The rest of the [Senior Business Team] makes in the low hundred thousand dollars and can't drop 50 percent. I tried to make up the difference plus a ton more with bonus equity so it ends with way more than 700k a year."

Koch sent three emails early in the morning on July 20, 2010. At 12:44 a.m., he emailed Barbara Zarankin, an HR representative, asking that she file a number of attached documents in his personnel file. These attachments generally recounted a conversation he had with SICM's outside counsel in April 2010 during which he "outlined [his] concerns related to Corporate Practice of Medicine."[5] Then, at 1:53 a.m., Koch emailed SICM employees who were scheduled to attend the Cherry Hill, New Jersey fat-grafting training and stated that he would not be attending the training scheduled for 8:00 a.m. that morning.

A minute later, Koch responded to Kent's July 19 email, writing that Quick had "made it very clear that my 43% paycut was a correction to 'market-based compensation.' " Further, while the "Equity Plan was briefly mentioned . . . specifics were TBD. Likewise, [Quick] mentioned a 'performance-based' bonus plan but the metrics for that were also TBD. Since I have never received a pay increase or bonus in my time at [Lifestyle Lift], I am skeptical that I would ever see this." Koch then closed the email: "All in all, this is completely unacceptable. Unless you come back with a fair pay reduction number (I will take the high end of what other Execs are taking—15%) and with Homer continuing in his position, then I will assume that I am being terminated for refusing to accept a paycut. I have not taken any vacation time in 2010 so will take my remaining time starting now and this will be applied to the remainder of July. I have several pending depositions related to [Lifestyle Lift] so Legal will need to reach an

---

[5] Koch sent hard copies of these attachments to Zarankin on Saturday, July 19, 2010. Zarankin states she only filed the requested attachments.

agreement with me on these. I will not be checking my [Lifestyle Lift] email any longer so can be reached at [my personal email]." Koch did not inform Kent that he had been scheduled to present a training session at 8:00 a.m. that morning in New Jersey and had canceled it.

Later on July 20, 2010, SICM terminated Koch's medical malpractice insurance.

On July 21, Koch sent emails to Ken Field and Patient Relations Group manager Sara Thibeault, stating: "I have refused a 43% paycut in addition to Homer (my only employee) being terminated. So as of now I am not working for [Lifestyle Lift]."

On July 22, Zarankin emailed Quick asking if she should shut down Koch's IT access and Quick stated she should, resulting in Koch losing access to his SICM email. Later that day, Quick emailed the Lifestyle Lift doctors stating that Koch had "decided to resign his position as the Chief Medical Officer of Lifestyle Lift," due to SICM's restructuring. Koch obtained a copy of this email and then emailed SICM's three regional directors: "I just want you to know that I did not resign. I refused to take a 43% paycut when other Execs were taking 10-15%  They are also going to terminate Homer, my only employee."

At some point, Kent attempted to call Koch and left him a message. On July 24, Koch sent Kent an email asking Kent what he wanted to discuss. Kent replied that same day: "Why you decided not to accept the offer or even call me before just saying you quit? I couldn't believe you wouldn't trade some short term paycheck money for equity. I don't get it. Also I don't know what your [sic] thinking and still want you part of the company . . . ? I'm lost as to what made you just jump ship without even a discussion but thought if there's even a chance of you staying in some way we should talk about it."

On July 29, Quick emailed the Lifestyle Lift doctors to address rumors about financial problems at SICM and the Lifestyle Lift clinics. This email stated that Koch's departure was "not at all financially motivated, but rather motivated by differences regarding the direction of the company. Despite making every effort to get all members of the management team on the same page, it simply was not possible. . . . [T]he

13

members of the management team that did not share the same vision have left and we wish them well in their next endeavors."

On July 31, Kent emailed Koch and asked him if they were going to talk after his vacation. The next day, Koch replied by stating that if Kent had a "significant proposition for me, then please email it. I am not going to do legal work for [Lifestyle Lift] at an hourly rate." On August 2, Kent replied: "I hate that this has gone downhill. I tried to make an amazing offer for you because I value you and you're a friend who has worked so hard for [Lifestyle Lift]. We have no money for anything until we get back on our feet. We budgeted everything to the penny. . . . I made something for you so the sacrifice today could bring you millions of dollars but you took it as a personal attack by [Quick] even though I tried to explain everything and the situation. I know you're not just out to make a buck living paycheck to paycheck and thought being part of my inner team and having ownership would be great. I feel bad for where we are today. You won't even talk to me. Is there any hope?"

V.      *Koch Files This Lawsuit*

Koch filed this action on May 9, 2012, alleging three wrongful termination causes of action against SICM as well as the individual Lifestyle Lift clinic professional corporations with which he had contracted (clinic defendants).[6] First, Koch alleged that he had been terminated from SICM and the Lifestyle Lift clinics in retaliation for his advocating for medically appropriate health care, in violation of Business and Professions Code section 2056. Second, he asserted a claim for retaliation for his complaint of unsafe care at a health care facility, in violation of Health and Safety Code section 1278.5. Finally, he claimed retaliatory termination in violation of public policy. Each cause of action claimed that Koch had been terminated in retaliation for his complaints regarding Taghizadeh, detailed above.

---

[6] The so-called clinic defendants are Coronado Surgery Associates, P.C.; Santa Ana Surgery Associates, P.C.; Beverly Hills Plastic Surgery Center, P.C.; Golden Gate Surgical, P.C.; and Lifestyle Florida East, P.C.

14

Defendants moved for summary judgment on all of Koch's claims or, in the alternative, for summary adjudication. As to claims against it, SICM made three alternative arguments. First, relying on the language of the Medical Director Agreement that referred to Koch as an independent contractor, SICM argued that Koch was an independent contractor and not an employee and could therefore not assert wrongful termination claims. Second, it argued that even if Koch was an employee, SICM had not terminated him, but rather Koch had resigned. Finally, SICM argued that even if Koch was an employee, and even if he had been terminated by SICM, Koch had failed to demonstrate that the termination was in violation of Business and Professions Code section 2056, Health and Safety Code section 1278.5, or public policy. As to the clinic defendants, SICM argued that Koch had failed to demonstrate that he had been terminated from any of the clinics or that he had suffered any damage.

Koch opposed SICM's motion. He argued that regardless of the language used in the Medical Director Agreement, he was SICM's employee because of the control it exercised over his performance of his duties. Koch then contended that whether he was terminated or resigned, and whether his termination was causally related to protected activity under the asserted statutes, were disputed issues of fact. Koch did not request additional time to conduct discovery pursuant to Code of Civil Procedure section 437c, subdivision (h) before responding to the defendants' motion.

Koch relied primarily on his own declaration and supporting exhibits in opposing SICM's summary judgment motion. He also submitted a declaration of an economist in support of his asserted damages, and a declaration by a California attorney, who was also a physician, who opined that SICM's policies and procedures constituted "corporate practice of medicine" in violation of California law.

The trial court held two hearings on SICM's motion. Prior to the first hearing on April 11, 2013, the trial court issued a tentative ruling granting SICM's motion in full. The tentative ruling stated that the "undisputed facts show that Defendants neither reduced Plaintiff's compensation nor terminated him." At the hearing, the court heard argument from both sides, and ultimately requested additional briefing on whether SICM

subjected Koch to an adverse employment action. Regarding these briefs, Koch's attorney agreed with the trial court that no further evidence would be submitted and the parties and the court would "work with what [they] have."

In addition to arguing why Koch had suffered an adverse employment action, Koch's supplemental brief requested a "further continuance" to permit Koch to obtain deposition testimony from additional witnesses and to obtain an unredacted version of the Conway MacKenzie report. Koch explained that additional depositions were necessary because facts which demonstrated that Koch's pay cut was part of a retaliatory plan "became known to counsel too late to present the evidence to the Court in opposition to the motion." SICM opposed the request for a continuance, arguing that the request was untimely, irrelevant, and that Koch's attorney had agreed at the first hearing that no further facts would be submitted.

The court issued a second tentative ruling prior to the second hearing on April 29, 2013. This tentative ruling denied Koch's request for a continuance and again found that Koch had failed to raise a triable issue of fact as to whether he had been actually or constructively discharged. The tentative ruling declined to address the parties' evidentiary objections because the parties had failed to comply with California Rules of Court, rule 3.1354 by not submitting a proposed order along with the objections. At the hearing, the trial court acknowledged that the written format of the objections was "correct" under the rules, but because there was no signature line for the judge to sign the objections as an order, the court "declines" to rule on the objections. This meant that all of the evidence would be included as part of the record. After hearing argument, the court took the matter under submission.

In a written order, the trial court granted SICM and the clinic defendants summary judgment.[7] The trial court noted that "termination is the common theme among all [of

---

[7] As to each issue in the first cause of action for which defendants sought summary adjudication, the trial court employed the confusing construct of identifying by "UMF" (undisputed material fact) number those "Matters raised by Plaintiff that were not genuinely disputed facts" and "Matters raised by Plaintiff that were disputed but were not

16

Koch's] causes of action" and that Koch had failed to establish that he had been terminated by any of the defendants. The court recognized that termination of employment can be either actual or constructive. As to Koch's actual termination theory, the court found there was "no evidence of actual termination. The employment, if any, was at-will and pursuant to a written contract that contained a 30-day notice of termination provision. Plaintiff submits <u>no evidence</u> that Defendant informed him that he was terminated or that Defendant invoked the 30-day notice provision under the written contract." Because Koch's contracts provided a procedure for termination, the court found that Koch's reliance on SICM terminating his medical malpractice insurance or access to the company's email system was misplaced. It stated: "The termination of the malpractice insurance and plaintiff's company e-mail account are not indicia of termination, because the contract defines the methodology for termination."

The court found that Koch's constructive discharge theory relied on Koch's assertion that a "43 percent reduction in salary could constitute such a drastic employment condition that a reasonable employee would have no choice but to quit." The court, however, found that this theory failed because it was "undisputed that Defendant SICM informed Plaintiff of an *intent* to reduce his annual salary" and that

material facts." The trial court described the difference: "In response to each of the undisputed material facts offered by defendants, Plaintiff attempted to fully or partially dispute various facts within each of the three issues. Some of the purportedly disputed facts were not genuinely disputed. Other disputed facts raised by Plaintiff were not material facts. Courts are not precluded from granting summary judgment merely because the parties dispute *immaterial* facts." As to the latter category ("disputed but . . . not material facts"), it appears that the trial court in effect determined that many of defendants' UMF's in their separate statement weren't material at all, and thus plaintiff's disputes as to those "immaterial" facts were equally immaterial and did not preclude granting summary adjudication for defendants. As a leading treatise has advised: "PRACTICE POINTER: . . . Include only those facts which are *truly material* to the claims or defenses involved because the separate statement effectively *concedes* the materiality of whatever facts are included. Thus, if a triable issue is raised as to any of the facts in your separate statement, the motion may be denied!" (Edmon, Rylaarsdam & Karnow, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2015) ¶ 10.95.1, p. 10-36.)

"Plaintiff refused to accept the reduction and asked for another proposal." It noted that after requesting another proposal, Koch told colleagues that "as of now I am not working for LSL" and that "[a]t the time Plaintiff's employment ended, his $700,000 annual salary was still in effect." The court also rejected Koch's argument that the "mere threat to reduce his salary" could constitute an act of retaliation to support his wrongful termination claims. Accordingly, the court concluded: "Plaintiff offers *no evidence* that Defendant ever imposed the proposed pay reduction, or any pay reduction at all. Thus, there is no merit to the claim that Defendants retaliated by 'substantially reducing his compensation.' " After having provided this reasoning, the trial court then noted that "Plaintiff has alleged no such cause of action for retaliatory constructive termination in his complaint."

Despite stating at the hearing that the parties had waived their evidentiary objections by failing to submit a proposed order, the trial court ruled on the objections in the summary judgment order, identifying the objection by paragraph number and stating, without more, whether the objection was overruled or sustained. The trial court denied Koch's request for a continuance, stating: "discovery on the reasons for termination are irrelevant. The Court makes this ruling given Plaintiff's failure to establish the essential element of termination as to each cause of action."

## DISCUSSION

I.    *Applicable Legal Principles*

A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment has the initial burden of showing either that one or more elements of the cause of action cannot be established or that there is a complete defense. (*Id.*, § 437c, subd. (p)(2).) If that initial burden is met, the burden shifts to the plaintiff to show the existence of a triable issue of fact with respect to that cause of action or defense. (*Ibid.*; see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850-853.) On appeal, " 'we take the facts from the record that was before the trial

18

court when it ruled on that motion. [Citation.] " 'We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' " [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party. [Citation.]' [Citation.]" (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 716-717.)

In his complaint, Koch contends he was wrongfully terminated in violation of (1) Business and Professions Code section 2056, (2) Health and Safety Code section 1278.5, and (3) public policy. Each of these three wrongful termination causes of action alleges that Koch complained of certain SICM policies and procedures, that these complaints were protected under the respective statutes, and that SICM retaliated against Koch for these complaints by terminating him.

The legal standard applicable to these claims is well established: "When a plaintiff alleges retaliatory employment termination either as a claim under the FEHA or as a claim for wrongful employment termination in violation of public policy, and the defendant seeks summary judgment, California follows the burden shifting analysis of *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [(*McDonnell Douglas*)] to determine whether there are triable issues of fact for resolution by a jury. [Citation.] In the first stage, 'the plaintiff must show (1) he or she engaged in a "protected activity," (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action.' (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.) If the employee successfully establishes these elements and thereby shows a prima facie case exists, the burden shifts to the employer to provide evidence that there was a legitimate, nonretaliatory reason for the adverse employment action. (*Morgan v. Regents of the University of California* (2000) 88 Cal.App.4th 52, 68.) If the employer produces evidence showing a legitimate reason for the adverse employment action, 'the presumption of retaliation " ' "drops out of the picture" ' " ' [citation], and the burden shifts back to the employee to provide 'substantial responsive evidence' that the employer's proffered reasons were untrue or

19

pretextual." (*Loggins v. Kaiser Permanente International* (2007) 151 Cal.App.4th 1102, 1108-1109 (*Loggins*).)[8]

California courts have split regarding how the *McDonnell Douglas* burden-shifting framework applies in the summary judgment context. On one hand, many decisions have recognized that the *McDonnell Douglas* framework was "originally developed for use at trial [citation], not in summary judgment proceedings" and, as a result, the burdens are actually reversed at the summary judgment stage, requiring that the defendant seeking summary judgment introduce evidence either that one or more of plaintiff's prima facie elements is lacking or that the adverse employment action was based on legitimate, non-retaliatory reasons. (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 344.) " '[A]lthough the burden of proof in a [discrimination] action claiming an unjustifiable [termination] ultimately rests with the plaintiff . . . , in the case of a motion for summary judgment or summary issue adjudication, the burden rests with the moving party to negate the plaintiff's right to prevail on a particular issue. . . . In other words, the burden is reversed in the case of a summary issue adjudication or summary judgment motion[.]' " (*Ibid.*, quoting *Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 150-151.) On the other hand, other courts have suggested that plaintiffs can survive an employer's motion for summary judgment only by introducing evidence at the outset that they can satisfy their prima facie case. (See *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 356-357 [describing, but not resolving, this split].)

---

[8] No published California case has articulated the standard to be applied in a retaliatory termination claim brought pursuant to Business and Professions Code section 2056 or Health and Safety Code section 1278.5. [**re-check this before filing**] However, both California and federal cases have employed the burden-shifting *McDonnell Douglas* framework for analyzing discrimination or retaliation claims brought under a number of statutes. (See, e.g., *Harrington v. Aggregate Industries Northeast Region, Inc.* (1st Cir. 2012) 668 F.3d 25, 30 [False Claims Act, 31 U.S.C. § 3730(h)(1)]; *Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1453 [FEHA and Labor Code, § 1102.5, subd. (b)].) Therefore, we apply this well-established framework to analyze Koch's claims that he was terminated in violation of Business and Professions Code section 2056 and Health and Safety Code section 1278.5

We conclude that the former approach is most consistent with California summary judgment law, which "places the initial burden on a moving party defendant to either negate an element of the plaintiff's claim or establish a complete defense to the claim." (*Swanson v. Morongo Unified School District* (2014) 232 Cal.App.4th 954, 965.) Thus, an "employer defendant may meet its initial burden on summary judgment, and require the employee plaintiff to present evidence establishing a triable issue of material fact, by presenting evidence that *either* negates an element of the employee's prima facie case, or establishes a legitimate nondiscriminatory reason for taking the adverse employment action against the employee." (*Id.* at p. 966.) This is the standard we will apply in reviewing the trial court's grant of SICM's motion for summary judgment.

II.      *Koch's Evidentiary Challenges*

Koch argues that the trial court did not properly consider plaintiff's evidence because it sustained many of SICM's objections to evidence. Koch does not make complete arguments as to any specific objections, but rather generally states that "none" of the trial court's evidentiary rulings were correct and SICM's evidentiary objections were "in all respects entirely frivolous." In support of this general argument, Koch contends that the various theories SICM asserted in support of many of its objections— for example, lack of foundation, hearsay, secondary evidence rule—were without merit, and cites some examples. SICM does not address these issues in its respondent's brief.

Koch's complaints against SICM's approach to evidentiary objections have some merit. SICM did not make just one objection to a given item of evidence. It took the blunderbuss approach. SICM raised more than 85 numbered objections to the various declarations Koch submitted in opposition to summary judgment, but frequently made multiple objections to the same testimony: for example, lack of foundation, lack of personal knowledge, speculation, improper opinion, improper legal conclusion, and the secondary evidence rule. Conservatively estimating that SICM raised about four separate objections to each of the approximately 85 numbered objections, SICM raised in excess of  340 objections to the four declarations submitted by Koch. This approach to objections leads us to ask the same question we did in *Nazir v. United Airlines, Inc.*

21

(2009) 178 Cal.App.4th 243, 257 (*Nazir*): "Can this be serious?  Can counsel see themselves rising at trial with those objections while plaintiff is testifying before a jury?" The answer is plainly no.

This indiscriminate approach to making objections obviously made it difficult for the trial court to rule on the objections.  In the face of multiple objections to the same material, the court was presented with a written document that asked it only to check the line "sustained" or "overruled."  In its separate written order, the court simply listed by objection number those objections it sustained and overruled, without more.  A further consequence of SICM's approach is that we have no basis on this record to understand the ground for the trial court's rulings as to what amounts to hundreds of objections.

Koch contends broadly that the "no foundation" objections appear to be frivolous, and again SICM is notably silent in response.  Koch asserts that twenty four of the *sustained* objections to Koch's declaration had "no foundation" as one of the multiple grounds for objection, together with speculation, lack of personal knowledge, and improper opinion.  SICM does not dispute that assertion, either.  But Koch's assertions are not sufficient to make the argument that the objections to evidence that were sustained were thus all decided erroneously.

In the same vein, it is not sufficient in this appeal for Koch to assert simply that the "secondary evidence rule" is a "meritless" basis for seven objections to evidence, or that "authentication" was not a proper basis for three others, or that the hearsay objections are all "equally meritless."  First, this isn't argument.  "One cannot simply say the [trial] court erred, and leave it up to the appellate court to figure out why." (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 368.)  "It is the responsibility of the appellant . . . to support claims of error with meaningful argument and citation to authority.  (Cal. Rules of Court, rule 8.204(a)(1)(B); *Badie v. Bank of Am.* (1998) 67 Cal.App.4th 779, 784-785.)  When legal argument with citation to authority is not furnished on a particular point, we may treat the point as forfeited and pass it without consideration.  [Citations.]" (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.)  Nor can we be expected to search the record to determine whether there is support for Koch's wide sweeping

22

contentions. (See *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545-546.) Second, even if we were to find merit in Koch's assertions on these particular points, it still doesn't address the merits of the numerous other asserted evidentiary grounds on which the trial court might have sustained an objection to certain testimony—none of which he addresses.

Further, Koch fails to inform us which evidentiary rulings actually matter to the determination of this appeal. On this score, once again SICM remains silent. SICM does not address the merits of Koch's evidence argument, nor does it contend that any of the evidence cited by Koch in its opening brief is outside the record.

On this record and with the briefs before us, we decline to walk through each of the objections sustained by the trial court to determine whether the ruling was correct. Instead, to the extent that we find that evidence to which an objection was sustained is relevant to our holding, we will address the evidentiary objections in the sections that follow.

III. *Koch's Prima Facie Case*

SICM argues in its brief, as it did before the trial court, that Koch cannot meet the elements of a prima facie case for retaliation under any of his causes of action. It contends that the undisputed evidence demonstrates that Koch did not engage in "protected activity" for purposes of the statutes on which Koch relies, that SICM did not discharge Koch, and that Koch cannot demonstrate any causal connection between any protected activity and an adverse employment action. We disagree and find factual disputes on each of these prima facie elements.

A. *Protected Activity*

SICM contends that Koch's various complaints, detailed above, do not constitute "protected activity" under either Business and Professions Code section 2056 or Health and Safety Code section 1278.5. We address each statute in turn.

1. *Business and Professions Code Section 2056*

Business and Professions Code section 2056 is designed to "provide protection against retaliation for physicians who advocate for medically appropriate health care for

23

their patients." (Bus. & Prof. Code, § 2056, subd. (a).) The statute defines "advocate for medically appropriate health care" as including "to protest a decision, policy, or practice that the physician, consistent with that degree of learning and skill ordinarily possessed by reputable physicians practicing according to the applicable legal standard of care, reasonably believes impairs the physician's ability to provide medically appropriate health care to his or her patients." (*Id.*, § 2056, subd. (b).)

SICM argues that Koch's complaints regarding Dr. Taghizadeh and the alleged corporate practice of medicine do not fit within the protections of this statute because Koch was complaining about his own influence and clout within SICM being eroded. They assert that Koch was not complaining that SICM's policies were interfering with his ability to provide medically appropriate health care to *his* patients.

As an initial matter, Koch contends that SICM failed to raise this argument in their motion for summary judgment or separate statement of undisputed material facts. Not so. SICM expressly argued in its motion for summary judgment that there "exists no evidence that Plaintiff advocated medically appropriate health care for patients under Business and Professions Code section 2056." Further, in the section of its separate statement devoted to Koch's section 2056 claim, the third issue identified for resolution was SICM's contention that there was "no evidence of any causal connection between Plaintiff's alleged termination and *activity protected under Business and Professions Code Section 2056*." (Emphasis added.) The allegedly undisputed facts presented by SICM in this section include descriptions of Koch's complaints to SICM personnel regarding Dr. Taghizadeh and the purported corporate practice of medicine. It is thus apparent that this argument was properly presented to the trial court.

SICM argues that Koch's complaints about Dr. Taghizadeh or the alleged corporate practice of medicine had nothing to do with Koch "providing medically appropriate health care to [Koch's] own patients." We conclude that Koch has demonstrated that there is a triable dispute of material fact on this point. Koch's complaints regarding Taghizadeh's practices included concerns regarding patients receiving "medically appropriate health care." For example, Koch in his declaration

24

described developing a "Safe Start" training program to roll out the newly purchased lasers in Lifestyle Lift clinics and get the physicians used to operating them. Koch discovered that Dr. Taghizadeh was going beyond this training program and advocating the use of advanced settings beyond those covered in the Safe Start training program, resulting in a patient being injured. Koch complained about this in an email to Kent, writing that Taghizadeh was "showing the physicians on his Center visits different laser settings than what we taught during our 'Safe Start' program. The purpose of this 'Safe Start' program is so all of the physicians have a basic laser experience for safety/medicolegal reasons prior to rolling-out the advanced settings." The record contains additional instances of Koch complaining that because of Dr. Taghizadeh's practices, SICM was unable to present a "uniform message" regarding training or medical information and that this "puts safety at risk."

More generally, Koch's complaints to Kent raised the concern that mixing business and medical considerations would run afoul of restrictions on corporate practice of medicine. For example, in an email to Kent, Koch expressed concerns that Taghizadeh's business integration visits improperly mixed business and medicine in violation of corporate practice of medicine rules. Further, in his declaration, Koch asserted that he told SICM's counsel of his complaints regarding his "concerns about California corporate practice of medicine restrictions" and "questionable practices of the company that may have violated the California corporate practice of medicine restrictions." While the precise nature of these complaints is unclear, in the paragraphs leading up to these statements, Koch outlines a number of SICM policies that, in his opinion, constituted undue corporate influence into physician's decisions—such as supervising and controlling work schedules and employment conditions or basing a physician's compensation, in part, based on the number of surgeries performed by that

25

physician compared to the number of patients that doctor saw.  It is a reasonable inference that these are the practices that Koch related to SICM's counsel.[9]

California's restriction on the corporate practice of medicine is "meant 'to protect the professional independence of physicians and to avoid the divided loyalty inherent in the relationship of a physician employee to a lay employer.' " (*California Physicians' Service v. Aoki Diabetes Research Institute* (2008) 163 Cal.App.4th 1506, 1514, quoting,

[9] It is unclear whether SICM objected to Koch's assertion that he relayed complaints to SICM's attorney, and equally unclear whether the trial court sustained these objections and, if so, on what ground.  This was because SICM's objections fail to comply with California Rules of Court, rule 3.1354, which requires a party objecting to evidence to "Quote or set forth the objectionable statement of material[.]"  (See also *Nazir, supra,* 178 Cal.App.4th at p. 256 ["Over 250 of the sustained objections failed to quote the evidence objected to, in violation of California Rules of court, rule 3.1354."])  Although SICM purported to list the paragraph number and lines of text to which it was objecting, it repeatedly failed to quote the entirety of the statement.  For example, SICM purported to object to the entirety of Paragraph 59 of the declaration by Koch in opposition to summary judgment, but it omitted material in the middle of and at the end of Paragraph 59.  This makes it unclear whether SICM intended to object to the entire paragraph or only those portions of the paragraph that it chose to quote.  This uncertainty was compounded by SICM's blunderbuss approach to making every conceivable objection to every objected-to piece of evidence.  Thus when the trial court simply stated that a particular numbered objection was sustained, it is impossible for us to tell what testimony is at issue and on what ground the objection was sustained.  In any event, if SICM in fact objected to Koch's statements to the SICM attorneys as hearsay, and if that is in fact an objection sustained by the trial court, this was error.  The fact that Koch discussed his concerns with SICM's attorney is not offered to show the truth of his complaints, but rather to demonstrate that he raised these concerns to SICM's counsel.  Further, while SICM argues these paragraphs are inconsistent with his deposition testimony because Koch allegedly "testified that he did not make any other complaints to . . . anyone else at SICM . . . other than those related to Dr. Taghizadeh's Business Integration visits," the cited portions of Koch's deposition reveal no contradiction.

Similarly, SICM apparently objected on multiple grounds to the paragraphs of Koch's declaration where he described various policies and practices by SICM that Koch found objectionable.  The trial court apparently sustained some of these objections as well, for reasons unknown.  To the extent Koch expressed legal opinions in these paragraphs, the trial court properly sustained the objection.  However, as discussed above, given Koch's position as SICM's medical director and member of the Senior Business Team, Koch could provide testimony as to SICM's policies and practices, and it was error to exclude it.

26

*California Medical Assn. v. Regents of University of California* (2000) 79 Cal.App.4th 542, 550.) It is therefore a policy meant to protect patients. A jury could reasonably conclude that Koch's complaints regarding the corporate practice of medicine involved his concern that SICM was improperly interfering with SICM's physicians' ability to render medically appropriate care. Accordingly, SICM is correct that Koch complained about his position as medical director being undermined by Taghizadeh and policies that he felt violated the bar on the corporate of medicine. However, these complaints go beyond what SICM describes as an internal struggle regarding the "distribution of power" and included complaints that implicated patient safety and care.

Further, a jury could reasonably conclude that these complaints related to Koch's ability to provide medically appropriate health care to "his" patients. First, it is undisputed that Koch provided surgical services in five Lifestyle Lift clinics and therefore saw patients. Because SICM's policies and practices applied to these clinics, a jury could thus conclude that the policies and practices affected Koch's ability to provide health care to his patients. Second, in his declaration, Koch stated that one of his duties as SICM's medical director was to provide "medical advice to physicians when requested in the treatment of patients at Lifestyle Lift clinics." Koch asserted that this established a "doctor-patient relationship with these patients."[10] Koch's role as consultant for physicians treating patients is confirmed by the Medical Director Agreement which provides that Koch would provide medical advice to physicians.

SICM finally argues that Koch's complaints regarding Dr. Taghizadeh and Taghizadeh's and SICM's alleged violation of the ban on corporate practice of medicine were not "reasonable" as required by the statute. However, SICM did not raise this argument before the trial court. While SICM did argue in the trial court that there was "no possible reasonable basis for believing Dr. Taghizadeh was an incompetent doctor," it did not argue that Koch's complaints regarding the purported corporate practice of

_____

[10] SICM objected to the statement that Koch had a "doctor-patient relationship" with these patients, but the trial court overruled this objection and SICM has not challenged this ruling.

27

medicine were unreasonable. Rather, SICM simply argued that "these complaints have nothing to do with Plaintiff giving medically appropriate health care to his own patients"—an argument we have now rejected. Accordingly, SICM has waived the argument that Koch's complaints regarding the corporate practice of medicine were unreasonable. (See *Newton v. Clemons* (2003) 110 Cal.App.4th 1, 11 [" 'Generally, issues raised for the first time on appeal which were not litigated in the trial court are waived. [Citations.]' ")[11]

As a result, Koch has demonstrated that a triable issue of fact exists as to whether he engaged in activity protected under Business and Professions Code section 2056.

### 2. *Health and Safety Code Section 1278.5*

Health and Safety Code section 1278.5 states that it is the "public policy of the State of California to encourage patients, nurses, members of the medical staff, and other health care workers to notify government entities of suspected unsafe patient care and conditions. . . . The Legislature finds and declares that whistleblower protections apply primarily to issues relating to the care, services, and conditions of a facility and are not intended to conflict with existing provisions in state and federal law relating to employee and employer relations." (Health & Saf. Code, § 1278.5, subd. (a).) This provision therefore prohibits a "health facility" from retaliating against any "patient, employee, member of the medical staff, or any other health care worker of the health facility" because the individual has "[p]resented a grievance, complaint, or report to the facility, to an entity or agency responsible for accrediting or evaluating the facility, or the medical

---

[11] Even if we were to address the merits of this argument, however, we would find that Koch had demonstrated the existence of a genuine dispute on this point. Koch presented the declaration of Kevin Jorgensen, an attorney whose practice focuses on healthcare law representing physicians, who, after reviewing the evidence proffered at the summary judgment stage, opined: "[T]he control which SICM has over the various MEDICAL GROUPS in California impermissibly invades into medical decisions and violates the corporate practice of medicine prohibition." Jorgensen similarly opined that SICM's policies improperly resulted in the "commercialism of medicine." Jorgensen's declaration provides a basis on which a jury could conclude that the corporate practice of medicine concerns raised by Koch were reasonable.

28

staff of the facility, or to any other governmental entity." (*Id.*, § 1278.5, subd. (b)(1)(A).) While this section does "not explicitly limit the type of 'grievance, complaint, or report' for which retaliation is prohibited to one involving concerns about the quality of patient care," this limitation is "implicit in other provisions of the statute." (*Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655, 667, fn. 6.)

SICM argues that Koch did not complain about unsafe patient care and therefore did not engage in any protected activity for purposes of Health and Safety Code section 1278.5. Its arguments on this point mirror those it raised to argue why Koch did not engage in protected activity under Business and Professions Code section 2056. We conclude that Koch has demonstrated the existence of a triable issue of fact as to whether he engaged in protected activity under Health and Safety Code section 1278.5. An extended discussion is not necessary on this point. For the reasons discussed above, just as a jury could reasonably conclude that Koch's complaints constitute "advocacy for medically appropriate health care" under Business and Professions Code section 2056, so too could a jury conclude that his complaints sought to address issues of unsafe patient care.

SICM next contends that Health and Safety Code section 1278.5 is inapplicable because SICM and the clinic defendants are not "health facilities" as defined by statute. "Health facility" is defined in Health and Safety Code section 1250 as follows: "As used in this chapter, 'health facility' means a facility, place, or building that is organized, maintained, and operated for the diagnosis, care, prevention and treatment of human illness, physical or mental, including convalescence and rehabilitation . . . for one or more persons, *to which the persons are admitted for a 24-hour stay or longer*[.]" (Emphasis added.) SICM argues that Lifestyle Lift patients are not admitted for a 24-hour stay or longer.

29

SICM has failed to demonstrate the absence of a triable issue as to whether SICM or the clinic defendants are "health facilities."[12]  In its brief, SICM argues that there is "no evidence that any Lifestyle Lift patient is admitted for 24-hour stays."  By this statement, however, SICM seeks to shift its burden of demonstrating that Koch cannot make his prima facie case to Koch.  As discussed above, this is improper.  Before the trial court, SICM failed to introduce evidence showing that Lifestyle Lift patients *are not* admitted for 24-hour stays.  On appeal, SICM relies on Koch's description of the Lifestyle Lift procedure as being a "minimally invasive method of facial cosmetic surgery requiring only a local anesthetic and thus no hospitalization."  This statement, however, does not demonstrate that Health and Safety Code section 1278.5 is inapplicable.  A general description of the Lifestyle Lift procedure or the fact that hospitalization was not "required" does not mean that patients were not admitted to a Lifestyle Lift clinic for recovery periods in excess of 24-hours.  Accordingly, SICM has failed to meet its burden of demonstrating the absence of a triable issue on this point.

B.     *Adverse Employment Action*

Throughout this litigation, SICM has argued that it did not subject Koch to any adverse employment action because SICM did not terminate him.  Rather, it has contended that Koch resigned his position.  The trial court agreed with SICM and granted SICM's motion for summary judgment on the basis that Koch had failed to demonstrate that he had been terminated by SICM.

Koch first contends that the trial court erred in requiring him to show that he was terminated (or constructively discharged) by SICM in order to proceed with his statutory retaliation claims.  Instead, Koch argues that his causes of action brought under Business and Professions Code section 2056 and Health and Safety Code section 1278.5 merely

---

[12] In any event, this issue is not properly before us on appeal.  In their motion for summary judgment and moving papers in the trial court, SICM did not raise the issue of whether Lifestyle Lift clinics were "health facilities" for purposes of liability under Health and Safety Code section 1278.5.  The issue was not raised until SICM's reply brief.  Counsel for SICM conceded this point at oral argument before us.

require him to demonstrate that SICM subjected him to an adverse employment action, short of termination, in retaliation for his protected activity. He states that he introduced sufficient evidence of such adverse employment actions, such as SICM drastically reducing his salary, cancelling his malpractice insurance, or terminating his administrative assistant.

Koch is correct that both Business and Professions Code section 2056 and Health and Safety Code section 1278.5 generally prohibit retaliatory acts, including those short of termination. Business and Professions Code section 2056 provides that "[n]o person shall terminate, retaliate against, or otherwise penalize a physician and surgeon for that advocacy [of medically appropriate care]." (*Id.*, § 2056, subd. (c).) Health and Safety Code section 1278.5 states that the discriminatory treatment of an employee barred by the statute "includes, but is not limited to, discharge, demotion, suspension, or any unfavorable changes in, or breach of, the terms or conditions of a contract, employment, or privileges of the employee . . . or the threat of any of these actions." (Health & Saf. Code, § 1278.5, subd. (d)(2).) The plain text of these statutes reveal that both sections prohibit an employer from taking *any* adverse action against an employee in retaliation for that employee engaging in activity protected by the statutes.

That Koch could have asserted retaliation causes of action under both statutes based on adverse employment actions short of termination does not mean that he did so. At the summary judgment stage, Koch's claims are limited to those asserted in his complaint. " 'The pleadings delimit the issues to be considered on a motion for summary judgment. [Citation.]' [Citation.] Thus, a 'defendant moving for summary judgment need address only the issues raised by the complaint; the plaintiff cannot bring up new, unpleaded issues in his or her opposing papers.' [Citation.]" (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1253.)

Koch asserted three claims in his complaint and labeled each of them as a claim for wrongful termination: (1) "Wrongful Termination in Violation of Business and Professions Code Section 2056"; (2) "Wrongful Termination in Violation of Health and Safety Code Section 1278.5"; and (3) "Wrongful Termination in Violation of Public

31

Policy." Under each cause of action, Koch alleged first that "Defendants retaliated against Plaintiff by initially substantially reducing his compensation *and then terminating him*" and second that the "actions of Defendants in retaliating against Plaintiff *by terminating his employment* was malicious and oppressive." (Emphases added.) Thus, while the statutory provisions on which Koch relies prohibit retaliation in the form of any adverse action, Koch's complaint narrowly alleged that SICM retaliated against him by terminating his employment.[13] Accordingly, in order to defeat summary judgment, Koch must demonstrate a triable issue of fact as to whether SICM retaliated against him by discharging him. (Cf. *Ferrick v. Santa Clara University* (2014) 231 Cal.App.4th 1337, 1343 ["To prevail on a claim for wrongful termination . . . a plaintiff must show . . . the defendant discharged the plaintiff"].) As discussed below, however, these "lesser" adverse employment actions are nonetheless relevant to determine whether SICM terminated Koch.

A termination can be either actual or constructive. (See *Steele v. Youthful Offender Parole Bd.* (2008) 162 Cal.App.4th 1241, 1253 [" 'Constructive discharge, like actual discharge, is a materially adverse employment action.' "]) In the Title VII context (42 U.S.C. § 2000e-3(a)), federal courts have noted that an actual discharge " 'occurs when the employer uses language or engages in conduct that would logically lead a prudent person to believe his tenure has been terminated.' " (*Fischer v. Forestwood Co.*

---

[13] This reading of Koch's complaint is supported by Koch's briefing before the trial court. In his brief opposing summary judgment, Koch argued: "Contrary to Defendants' arguments, the overwhelming undisputed facts in this case point to but one conclusion: that Koch was an employee of Defendants who was terminated in retaliation for repeatedly complaining about Defendants' violations of California law involving patient safety, the illegal corporate practice of medicine and sexual harassment of patients and employees[.]" He further argued: "Whether Dr. Koch is deemed an employee or an independent contractor, it is undeniable that he was in a contractual relationship with SICM which was terminated after he opposed SICM's illegal policies, practices and procedures. This is exactly what Business and Professions Code section 2056 and Health and Safety Code section 1278.5 were designed to protect against." Nowhere in this brief did Koch contend that the court should deny defendants' motion for summary judgment because his statutory claims were actionable without a showing of termination.

32

(10th Cir. 2008) 525 F.3d 972, 979-980, quoting *Chertkova v. Connecticut General Life Ins. Co.* (2d Cir. 1996) 92 F.3d 81, 88.)[14] A constructive discharge, by contrast, "occurs when the employer's conduct effectively forces an employee to resign. Although the employee may say, 'I quit,' the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will. As a result, a constructive discharge is legally regarded as a firing rather than a resignation." (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1244-1245.)

Koch contends that he introduced sufficient evidence to create a triable issue as to whether SICM actually or constructively discharged him. SICM contends that plaintiff may not rely on a constructive discharge theory because he failed to plead it in his complaint. SICM is correct that Koch's complaint does not expressly plead constructive discharge, but rather generally alleged that SICM "terminated" him. For example, he alleged: "Immediately after the Company's receipt of that letter, Quick terminated Plaintiff from his positions with the Company." In addition, Koch did not argue a constructive discharge theory in his brief in opposition to SICM's motion for summary judgment. Instead, he simply argued that whether he "was fired or quit is a disputed material fact." It appears the question of whether SICM constructively discharged Koch was first raised by the trial court. In its order granting summary judgment, the trial court stated: "At the conclusion of the [first] hearing [on SICM's motion for summary judgment], this Court invited Plaintiff to submit further briefing to address the three issues stated in the previous tentative ruling dated April 11, 2013: whether (1) plaintiff's salary was reduced, (2) Defendants discharged Plaintiff, and (3) Defendants constructively discharged Plaintiff." Ultimately, we need not reach the question of

---

[14] Because California law prohibiting employment discrimination and retaliation is similar to federal law, "California courts look to pertinent federal precedent when applying our own statutes." (*Guz v. Bechtel National, Inc., supra,* 24 Cal.4th at p. 354, see also *Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 475-476 ["Lawsuits claiming retaliatory employment termination in violation of [FEHA] are analogous to federal 'title VII' claims . . . , and are evaluated under federal law interpreting title VII cases"].)

whether Koch properly raised the issue of constructive discharge in his complaint, because we find that Koch has demonstrated a triable issue as to whether SICM actually terminated him.

The triable issue on this question is created by the fact that both Koch's and SICM's actions in July 2010 are subject to competing, and reasonable, interpretations. On one hand, SICM argues that the 43 percent pay cut, which ultimately led to Koch's separation from SICM, was merely "proposed" and that Quick never told Koch "whether or when" the pay cut could be implemented. Further, SICM can point to Koch's July 20 email to Kent in which he stated that unless Kent came "back with a fair pay reduction number . . . and with [Koch's assistant] continuing in his position, then I will assume that I am being terminated for refusing to accept a paycut." In this same email Koch stated that he would not be checking his work email "any longer" and that SICM's legal department would "need to reach an agreement with [Koch]" regarding several pending depositions. It can then point to the fact that Koch suddenly cancelled a training he was supposed to give that same morning and on July 21 emailed two colleagues stating "as of now I am not working" for SICM because of his refusal to accept a 43 percent pay cut. SICM could argue that its actions of terminating Koch's malpractice insurance and IT access was simply a response to Koch's express resignation. As a result, there is evidence from which a jury could conclude that Koch voluntarily resigned his position at SICM.[15]

On the other hand, however, Koch can use the party's conduct during this same time frame to support a reasonable inference that SICM terminated him. Contrary to SICM's assertion that the pay cut was only "proposed," Koch testified in his deposition that Quick said Koch "had to take" the 43 percent pay cut. Additionally, the July 20 email can be reasonably read as Koch expressing his view that the 43 percent pay cut was unacceptable, that he wanted to negotiate a more equitable deal with Kent, and that he

---

[15] In its brief, SICM argues that the alleged threat to cut Koch's pay did not constitute an anticipatory repudiation of the Medical Director Agreement. We need not reach this question as Koch has not brought a breach of contract claim.

34

was informing Kent that he was taking vacation for the rest of July. If the jury reads the email in this way, it could reasonably conclude that Koch did not resign. This reading of the July 20 email finds further support in Kent's late-July and early-August emails to Koch. Kent expressly acknowledged that Koch was on vacation in late July and continued to engage Koch in an attempt to reach a deal. Such statements are arguably inconsistent with a finding that Koch resigned.

If a jury were to find that Koch did not resign on July 20, it could then reasonably conclude that SICM terminated him because Quick terminated Koch's medical malpractice insurance, shut down his IT access, and informed Koch's colleagues that Koch had "resigned" in the immediate aftermath of the July 20 email. Finally, it is undisputed that SICM did not pay Koch at the beginning of August, as called for under the Medical Director Agreement. These actions by Quick prevented Koch from performing his role as medical director and, based on these actions, a jury could conclude they effectively terminated Koch. To the extent that Koch told two of his colleagues on July 21 that "as of now I am not working for [SICM]," a jury could read this statement in light of the fact that Quick had unilaterally terminated Koch's medical malpractice insurance the day before.

At the summary judgment stage, "it is not our job to weigh the evidence, but, rather, to consider whether the proffered evidence would provide a sufficient basis for a finding in favor of the nonmoving party." (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 326, fn. 16.) Koch, as the non-moving party, is entitled to have the evidence viewed in the light most favorable to his position. (*Chavez v. Glock, Inc.* (2012) 207 Cal.App.4th 1283, 1302.) Viewing the evidence in this light, a jury could reasonably conclude based on the evidence that Koch did not resign but rather was terminated by SICM. As a result, a triable issue exists as to whether Koch was subject to an adverse employment action for purposes of his wrongful termination claims.

C.     *Causal Link Between Protected Activity and Adverse Action*

The final element of Koch's prima facie case requires that Koch demonstrate a causal link between his protected activity and SICM's decision to terminate him.

35

" ' "The causal link may be established by an inference derived from circumstantial evidence, 'such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment decision.' " [Citation.]' [Citation.]" (*Morgan v. Regents of University of California, supra,* 88 Cal.App.4th at pp. 69-70.)

SICM argues that there is insufficient evidence to support an inference of retaliation, because the temporal proximity between any protected activity and the alleged termination is too attenuated. It contends that Koch complained about Taghizadeh and raised his concerns about the corporate practice of medicine no later than April 21, 2010—three months before the alleged wrongful termination. SICM relies on the United States Supreme Court case of *Clark County School District v. Breeden* (2001) 532 U.S. 268, where the Court stated in the Title VII context that cases that accept "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.' " (*Id.* at p. 273.) The court cited federal cases suggesting that a three or four-month period between protected activity and adverse employment action was insufficient to give rise to an inference of causality. (*Ibid.*)

SICM, however, both ignores applicable California law and fails to read the record in a light most favorable to Koch. Notwithstanding the Supreme Court's holding that a three or four-month gap will generally not support an inference of retaliatory motive in Title VII cases, Health and Safety Code section 1278.5 expressly provides a "rebuttable presumption that discriminatory action was taken by the health facility . . . in retaliation against an employee . . . if responsible staff at the facility . . . had knowledge of the actions . . . and the discriminatory action occurs within 120 days of the filing of the grievance or complaint by the employee[.]" (Health & Saf. Code, § 1278.5, subd. (d)(1).) Because the alleged wrongful termination in this case occurred in July 2010, and SICM concedes that Koch made complaints in April 2010, the rebuttable presumption of this section 1278.5 applies.

36

As to Koch's other causes of action, Koch stated in his declaration that in June 2010, SICM's counsel asked him about his concerns that he was being terminated and, in response, Koch told him about his "continual protests to the company, Quick and Dr. Kent about both Dr. Taghizadeh and the concerns about California corporate practice of medicine restrictions." Taking this statement in the light most favorable to Koch, a jury could conclude that he engaged in protected activity in June 2010—a mere month before Koch was allegedly targeted for a substantial pay cut and then terminated. This close temporal proximity is sufficient to give rise to the inference that Koch's termination was causally related to his protected activity. (Cf. *Lakeside-Scott v. Multnomah County* (2009) 556 F.3d 797, 813 ["This close temporal proximity [approximately 1 month] was probably sufficient evidence on its own to support the jury's conclusion that Brown was motivated by retaliatory animus when she reported Scott"].)[16]

## IV.    *SICM's Asserted Non-Retaliatory Reason and Koch's Evidence of Pretext*

SICM contends that even if Koch can establish a causal connection between his protected activity and an adverse employment action,  it has offered a legitimate, non-retaliatory reason for its actions and Koch has not presented sufficient evidence of pretext. Specifically, SICM contends that it requested that Koch take a 43 percent pay cut in reliance on the recommendation contained in the Conway MacKenzie report, and not out of retaliation for Koch's various complaints.

___

[16]    As further evidence of retaliatory intent, Koch points to his declaration where he stated that Jeff Mosley, SICM's chief financial officer, told him on July 7 that "Quick had targeted me for termination" by insisting on the pay cut "under the guise of the Conway MacKenzie report." SICM, as was typical of its practice in this motion, objected to this evidence on multiple grounds:  hearsay, lack of foundation, lack of personal knowledge, speculation, improper opinion, improper legal conclusion. The trial court sustained some objection to this evidence, although we cannot tell which one or on what basis. Koch argues that this is "statutorily allowed hearsay as an admission by a company officer" under Evidence Code Section 1220. Ultimately, we need not resolve whether an exception to the hearsay rule has been established under Evidence Code section 1220 (or § 1222, since Mosley was the chief financial officer), because Koch can make his prima facie case for purposes of defeating summary judgment without this evidence.

37

To begin, we note that SICM's articulated legitimate reason addresses only the 43 percent pay cut SICM sought to impose on Koch. SICM has not argued it they had a legitimate, non-retaliatory reason for terminating Koch. Rather, as we have discussed, SICM has consistently taken the position that Koch was not terminated, but resigned. As a result, SICM's alleged non-retaliatory reason for imposing the 43 percent pay cut does not squarely address its reason for terminating Koch were a jury to find it did terminate him. At the same time, it appears that it was SICM's attempt to impose a 43 percent pay cut on Koch that set in motion a series of events that eventually led to Koch's alleged termination. Accordingly, we will address whether SICM has sufficiently supported its purported non-retaliatory reason for imposing this pay cut and whether Koch has introduced sufficient evidence that this reason is a mere pretext.

SICM introduced sufficient evidence suggesting a legitimate, non-retaliatory reason for requesting that Koch take a 43 percent pay cut. SICM introduced a copy of the Conway MacKenzie report. While the precise financial details of the report are redacted, the report indicates that SICM had "significant overhead structure and expenses" and that given a "restrictive lending agreement" SICM had entered in February 2010, it was "assumed that SICM will be in violation of the shareholder equity covenant as of June 30, 2010," causing SICM to have to operate on cash receipts. In light of this, Conway MacKenzie recommended a series of across the board cuts in salary for members of SICM's "Senior Business Team." Both Kent and Quick testified in their depositions about the "cash crunch" SICM experienced in 2010, and how it required cutting expenses. Finally, in his emails to Koch regarding the pay cut, Kent emphasized that SICM had "no money (cash) and we need to cut a ton of costs."

The burden thus shifts to Koch to " 'offer substantial evidence that the employer's stated [nonretaliatory] reason for the adverse action was untrue or pretextual, or evidence the employer acted with a [retaliatory] animus, or a combination of the two.' " (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 160, quoting *Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1004-1005.) While a close issue, we find that Koch has introduced sufficient evidence from which a jury could reasonably

38

conclude that SICM's nonretaliatory justification is pretextual. (See *McRae v. Department of Corrections and Rehabilitation* (2006) 142 Cal.App.4th 377, 398 ["[P]laintiff must produce substantial evidence from which the jury can find that defendants' reasons for their actions are false or pretextual."])

First, there is the undisputed fact that SICM sought to reduce Koch's salary by 43 percent while the Conway MacKenzie report recommended that the *other* members of the Senior Business Team have their base salaries reduced by only 5 percent to 15 percent. Additionally, Steve Higginbotham, SICM's COO, testified in his deposition that Conway MacKenzie did not independently arrive at the recommendation to cut Koch's pay by 43 percent. Rather, he testified that the figure was arrived at in a "side bar conversation that Dr. Kent, Gordon [Quick] and [Higginbotham] had in general as it relates to medical director compensation." Of course, there may be a perfectly legitimate reason for Koch having his pay cut. Kent in one email to Koch expressly stated as such when he wrote that the "rest of the [Senior Business Team] makes in the low hundred thousand dollars and can't drop 50 percent." It is up to the jury, however, to determine whether this reason asserted is credible.

Second, as detailed above, there is the close proximity between Koch detailing his complaints to SICM's counsel and the alleged adverse employment action. SICM is correct that case law states that "temporal proximity, although sufficient to shift the burden to the employer to articulate a nondiscriminatory reason for the adverse employment action, does not, without more, suffice also to satisfy the secondary burden borne by the employee to show a triable issue of fact on whether the employer's articulated reason was untrue and pretextual." (*Loggins*, *supra*, 151 Cal.App.4th at p. 1112.) At the same time, however, "[t]his is not to say that temporal proximity is never relevant in the final step of the *McDonnell Douglas* test. In the classic situation where temporal proximity is a factor, an employee has worked for the same employer for several years, has a good or excellent performance record, and then, after engaging in some type of protected activity . . . is suddenly . . . terminated. In those circumstances, temporal proximity, *together* with the *other* evidence, may be sufficient to establish

pretext." (*Arteaga v. Brinks, Inc.*, *supra*, 163 Cal.App.4th at pp. 353-354.)  Here, Koch worked for SICM for 2 years and apparently performed well enough to have Kent promote him to medical director.  In fact, Kent continually told Koch that he was a valued member of the SICM team.  The arguable temporal proximity between Koch's complaints and his alleged termination therefore is properly considered as a non-dispositive factor that could support a finding of pretext.

Finally, there is inconsistency in what SICM officials stated at the time regarding the proposed pay cut and Koch's departure.  As detailed above, Kent told Koch in emails that the 43 percent pay cut was needed because of SICM's short-term financial problems.  At the same time, however, both Quick and Higginbotham testified that the recommendation to cut Koch's pay so substantially was because of their view that $300,000 to $400,000 was more in line with what the market paid administrative medical directors.  Then, on July 29, Quick sent an email to SICM personnel to "dispel" a rumor that the "reason for all the reductions and recent changes was because [SICM is] having financial problems and [is] going out of business."  He stated that "nothing [was] further from the truth" and the "company's financial position has never been stronger."  In this email, Quick wrote that Koch's departure was "not at all financially motivated, but rather motivated by differences regarding the direction of the company.  Despite making every effort to get all members of the management team on the same page, it simply was not possible.  As Abraham Lincoln said, '*A house divided against itself cannot stand*.'  Such an outcome was not something that the management team was going to allow to happen to Lifestyle Lift.  Thus, the members of the management team that did not share the same vision have left and we wish them well in their next endeavors."

SICM argues, however, that at most this evidence shows "some inconsistency" and is not sufficient, without more, to establish pretext.[17]  It relies on *McGrory v. Applied*

---

[17] SICM also argues that Koch has "waived" this inconsistency argument by not raising it in his opening brief.  In his opening brief, however, Koch specifically attacked the reasoning employed by the trial court in granting summary judgment—that he had not shown that he was terminated.  In supporting the trial court's grant of summary judgment,

*Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, where the court found that plaintiff had not demonstrated that the employer "has offered fundamentally different justifications for terminating" him. (*Id.* at p. 1531.) The court stated that "there must be more than inconsistent justifications for an employee's termination to support an inference that the employer's true motivation was discriminatory." (*Ibid.*) It recognized that while "[p]roof that the employer's proffered reasons are unworthy of credence may 'considerably assist' a circumstantial case of discrimination," there must still "be evidence supporting a rational inference that *intentional discrimination*, *on grounds prohibited by the statute*, *was the true cause* of the employer's actions." (*Ibid.*; see also *Guz v. Bechtel National, Inc.*, *supra*, 24 Cal.4th at pp. 360-361 ["Moreover, an inference of intentional discrimination cannot be drawn solely from evidence, if any, that the company lied about its reasons. The pertinent statutes do not prohibit lying, they prohibit discrimination"].)

Here, however, the discrepancies in SICM's asserted reasoning are more than "some inconsistency." Rather the two justifications offered by SICM—first that the pay cut was sought for financial reasons and then the assertion that Koch left for reasons that were "not at all financially motivated, but rather motivated by differences regarding the direction of the company"—are contradictory. Further, as detailed above, Koch does not rely solely on SICM's shifting reasons for its conduct, but has also introduced evidence that he was targeted with a significantly more severe pay cut and that there is close temporal proximity between his complaints and alleged termination. Combined, this evidence is sufficient to have a jury decide whether SICM's articulated reasons are pretextual.

V.  *Remaining Issues*

Defendants argue that summary judgment was proper as to Koch's claims against the various clinic defendants because (1) the undisputed record shows that he was not

SICM in its respondents' brief raised many of the issues we address here, such as whether Koch actually engaged in protected conduct and whether he could establish a causal relationship. Koch was therefore entitled to reply to these arguments.

terminated, and (2) even if he was terminated, Koch was unable to articulate a theory of how he was damaged by that termination. The first argument is readily disposed of in light of our holding that there is a triable issue of fact as to whether SICM terminated him. The record establishes that the same decision makers are involved with both SICM and the clinic defendants, and Koch's SICM salary also compensated him for any work done pursuant to his contract with the clinic defendants. During his deposition, Koch was repeatedly unable to articulate how he was damaged by the clinic defendants separate and apart from any damage he suffered by SICM. In light of the undisputed fact that Koch was reimbursed for any work done at the Lifestyle Lift clinics through his SICM salary, it is unclear how Koch suffered any separate damages by being terminated by the individual clinics. SICM, however, has failed to cite any case law in support of the proposition that they are entitled to summary judgment under the facts of this case due to Koch's failure to demonstrate damages as to these defendants.

Further, in his opening brief, Koch argues that there is a triable issue of fact as to whether he was an employee as opposed to an independent contractor. In its motion for summary judgment, SICM argued that Koch's claims failed because he was not an employee of SICM, but rather an independent contractor. The trial court, however, did not rule on this issue. Additionally, SICM has failed to respond to Koch's arguments in any way, an omission we construe as a concession that a triable issue exists on this point.

Finally, Koch argues on appeal that the trial court erred in denying his request to continue the summary judgment hearing to allow him to conduct additional discovery. In light of our holding that the trial court erred in granting the summary judgment, Koch's challenge to the trial court's order on this point is moot.

## DISPOSITION

Triable issues of fact exist as to each of Koch's causes of action against defendants. Accordingly, the trial court erred in granting defendants' motion for summary judgment. The judgment is reversed and remanded for further proceedings. Koch is awarded costs on appeal.

42

_____

Miller, J.

We concur:

_____

Kline, P.J.

_____

Richman, J.